IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAMERON HOOKER,<br><br>          Plaintiff,<br><br>     vs.<br><br>D. ADAMS, et al.,<br><br>          Defendants.<br>_____/ | CASE NO. CV-F-04-6584 LJO DLB P<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED<br><br>[Doc. 64] |

I.    Background

Plaintiff is a state prisoner proceeding pro se and in forma pauperis in a civil rights action pursuant to 42 U.S.C. § 1983. Now pending before the court is defendants' motion for summary judgment, filed March 10, 2008. Plaintiff filed an opposition on May 22, 2008 and defendants filed a reply on June 2, 2008. Plaintiff filed a sur-reply on June 9, 2008. Neither the Federal Rules of Civil Procedure nor the Local Rules provide a right to file a sur-reply. Plaintiff did not seek and was not granted permission to file a sur-reply and the sur-reply shall not be considered. The court notes for the record that even if it had considered the sur-reply, the result of this Findings and Recommendations would not have been altered.

This action is proceeding against defendants Adams and Woodford ("defendants") on plaintiff's amended complaint filed February 27, 2006 alleging that defendants discriminated against him in violation of the Americans with Disabilities Act ("ADA"). Plaintiff is seeking both injunctive relief and

money damages.

II.     Plaintiff's Allegations

In his first amended complaint, plaintiff alleges that he is dyslexic, reads very slowly and has a 4th grade spelling level. He states that on July 6, 1993, he purchased a typewriter with spelling and grammar check under the belief that he would be able to retain the typewriter. He also states that between the year 2000 and 2001, he bought a color television. Plaintiff was transferred from Folsom State Prison to the Substance Abuse Treatment Facility ("SATF") on November 19, 2003. Plaintiff states that upon arrival at SATF, he was told that the typewriter and the television were not allowed. Plaintiff contends that while the prison allows typewriters that people with normal spelling and writing skills can use, the prison prohibits typewriters needed by dyslexic inmates, such as plaintiff. Plaintiff contends that defendants have refused to recognize his disability which would allow him to use the ADA-designated computer in facilities libraries.

II     Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in

1  Rule 56(c), is satisfied." Id. at 323.

2      If the moving party meets its initial responsibility, the burden then shifts to the opposing party
3  to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co.
4  v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

5      In attempting to establish the existence of this factual dispute, the opposing party may not rely
6  upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of
7  affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule
8  56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention
9  is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v.
10 Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,
11 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a
12 reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818
13 F.2d 1433, 1436 (9th Cir. 1987).

14     In the endeavor to establish the existence of a factual dispute, the opposing party need not
15 establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute
16 be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W.
17 Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and
18 to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587
19 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

20     In resolving the summary judgment motion, the court examines the pleadings, depositions,
21 answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c). The
22 evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable
23 inferences that may be drawn from the facts placed before the court must be drawn in favor of the
24 opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655
25 (1962)(per curiam). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's
26 obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen
27 Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

28     Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that

there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

III.   Summary of Undisputed Facts

    1.   On October 31, 1985, Plaintiff was convicted of six counts of rape by force, one count of forcible oral copulation, one count of rape with a foreign object, one count of forcible sodomy and one count of kidnapping and was sentenced to 98 years in prison for those offenses.

    2.   At all times relevant to the complaint, Plaintiff was a state prisoner in the custody of the California Department of Corrections and Rehabilitation (CDCR).

    3.   In the present lawsuit, Plaintiff is suing the Warden of SATF and the Director of the CDCR in their official capacities for violating his rights under the Americans with Disabilties Act (ADA).

    4.   While housed at Folsom State Prison (FSP) in 1994, Hooker purchased a Brother WP 680 typewriter with spelling and grammar check features.

    5.   The Brother WP 680 typewriter contained 27k of internal memory.

    6.   On November 19, 2003, Hooker was transferred from FSP to SATF.

    7.   Upon his arrival at SATF, Hooker's typewriter was confiscated pursuant to SATF's local operational policy governing inmate property.

    8.   Under California Code of Regulations, title 15, section 3380(c), subject to the approval of the Director of Corrections, wardens at each institution will establish such operational plans and procedures required to implement the regulations. These procedures apply only to the inmates under the warden at each institution.

    9.   At the time Hooker's typewriter was confiscated, SATF's Operational Procedure (OP) governing inmate property was outlined in OP 201XVI(A)(1), stating, "All appliances with internal mechanisms for recording capability or transmitting capability will not be allowed. Appliances shall have been manufactured without such capability."

    10.   OP 201 applied equally to all inmates housed at SATF.

11. OP201XV1(A)(1) was implemented by SATF prison officials because electrical devices with internal memory capabilities pose particular dangers and concerns to institutional safety and security because of their ability to store sensitive information regarding institution operations, staff members and information relating to fellow inmates, such as gang activities and "hit lists."

12. In his complaint, Hooker alleges that he is dyslexic.

13. Hooker's central file lacks any history if, or reference to, a verified learning disability, such as dyslexia.

14. Hooker has never been formally tested for having a learning disability.

15. Hooker admits that he lacks documentary evidence supporting his claim that he has a verified learning disability.

16. In early 2004, Disability Placement Program (DPP) Teacher Bergmann attempted to verify whether Hooker had nay documentation supporting his claim of having a learning disability.

17. Verification can be accomplished by any of the following: (1) diagnosis from a licensed psychologist, a credentialed school psychologist, or a licensed educational psychologist; (2) a probation officer's report where the probation officer verified a specific learning disability with a school district; or (3) a school transcript from a California public school or a non-CaliforNia school, with special education requirements equivalent to California Education Code, Sections 56333-56347, that reflect either an individualized education plan (IEP) denoting a specific learning disability, or enrollment in Special Education and/or Section 504 classes or services denoting specific learning disabilities.

18. On or around April 22, 2004, DPP Teacher Bergmann authored a memorandum to Hooker informing him that he was unable to find documentary evidence supporting Hooker's claim of having a learning disability and therefore Plaintiff was no eligible for the DPP.

19. DPP Teacher Bergmann was unable to find documentary evidence supporting Hooker's claim of having a learning disability because upon contacting all of Hooker's schools,

       Mr. Bergmann was unable to find any reference to or mention of Hooker's enrollment in special education classes or of having a learning disability. Moreover, Mr. Bergmann informed inmate Hooker that he received information that contradicted Hooker's claim of having a learning disability, such as: (a) a review of Hooker's high school transcript revealed that he received passing grades, B's and C's, in high school English; (b) Hooker received a high school diploma; and (c) Hooker received a 12.9 Reading Score and 9.4 Language Score on a Test of Adult Based Education (TABE) taken on September 26, 2001.

20. Hooker's only evidence that he has a learning disability is his own self-diagnosis and the opinions of several untrained lay people and fellow inmates.

21. The TABE is a timed, multiple choice, norm-referenced test designed to measure students' achievement of basic skills.

22. Reading, language, mathematics and spelling are the areas measured.

23. A TABE score of 4.0 or lower is one indicator that the person may have a learning disability.

24. With a maximum achievable score of 12.9, representing college-level achievement, the score an inmate receives is a reflection of their Grade Level Equivalence (GLE).

25. Hooker took the TABE test on September 26, 2001.

26. His TABE scores were as follows: Reading Score: 12.9; Math Score: 8.2; Language Score: 9.4; Total Battery: 11.0.

27. Sometime in 2004, Hooker purchased another typewriter.

28. This typewriter beeps when he misspells a word.

29. Hooker is able to type documents with his typewriter as well as handwrite documents with a pen and paper.

30. Hooker is able to file appeals, pleadings and communicate with individuals outside SATF with the help of other inmates.

31. None of Hooker's appeals or court filings have ever been rejected because of poor spelling or grammar.

32. Hooker states that not being able to possess a typewriter with grammar and spell check features and having another inmate review and edit his work, is an inconvenience.

33. Hooker cannot articulate which prison program, service or activity he was excluded from or denied participation in because of his inability to spell correctly.

34. Hooker has no evidence that Defendants instituted OP 201, governing inmate property, for purposes of intentionally discriminating against individuals with a learning disability.

35. Hooker is currently housed in A Yard at SATF.

36. The A Yard library maintains four general legal computers, termed Gilmore computers and one computer designated for those inmates who are covered under the ADA.

37. Inmates may use the computers in two-hour increments, based upon their designation, priority-user status and availability.

38. The Gilmore computer contains cases and legal-related books and information which inmates are ale to scan and review. The Gilmore compute does not have word processing capabilities.

39. The ADA-designated computer is reserved for only disabled inmates on the Disability Placement Program (DPP) list. The ADA-designated computer has word processing features, but does not have spelling or grammar check features available to inmates.

40. A Yard library is open on Tuesday though Saturday from 9:00 AM to 3:30 PM. Inmates who do not have work or school assignments can come to the library as soon as the yard opens. Inmates must wait in line to use the library and are granted access throughout the day, depending on space availability.

41. Due to space limitations and safety and security concerns, only sixteen inmates are allowed in the library at any one time.

IV. Americans with Disabilities Act Claim

Title II of the Americans with Disabilities Act (ADA) "prohibit[s] discrimination on the basis of disability." Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir. 2002). Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to

discrimination by such entity." 42 U.S.C. § 12132. Title II of the ADA applies to inmates within state prisons. Pennsylvania Dept. of Corrections v. Yeskey, 118 S.Ct. 1952, 1955 (1998); see also Armstrong v. Wilson, 124 F.3d 1019, 1023 (9th Cir. 1997); Duffy v. Riveland, 98 F.3d 447, 453-56 (9th Cir. 1996). "To establish a violation of Title II of the ADA, a plaintiff must show that (1) [he] is a qualified individual with a disability; (2) [he] was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities; and (3) such exclusion or discrimination was by reason of [his] disability." Lovell, 303 F.3d at 1052.

A qualifying "disability" is "(A) a physical or mental impairment that substantially limits one or more of the major life activities of the person; (B) having a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). A "major" life activity is one that is "of central importance to daily life." Toyota Motor Mfg., Inc. V. Williams, 534 U.S. 184, 197 (2002). A limitation on a major life activity is "substantial" if it interferes to a large degree with a major life activity. Id.

**A.     Defendant's Motion**

Defendants contend they are entitled to summary judgment because plaintiff cannot show that he is an individual with a disability deserving protection under the ADA or that he is otherwise qualified to participate in or receive the benefit of a specific prison service, program or activity. Defendants also argue that there is no evidence that plaintiff was discriminated against because of his disability.

Defendants argue that even assuming dyslexia is an impairment and that learning and reading are major life activities, plaintiff cannot demonstrate that he is "disabled" under the ADA. Defendants point out that upon receiving notice that plaintiff claimed to suffer from dyslexia, prison officials attempted to verify if plaintiff had a learning disability through educational records or other legitimate source documents. DUF 16-19. Prison officials were unable to obtain verification that plaintiff suffered from a learning disability and in fact received information that contradicted plaintiff's claim. DUF 18-19.

In support of their motion, defendants submit the declaration of D. Bergmann, Disability Placement Program (DPP) Teacher in the Education Department at SATF. Mr. Bergmann's duties as a DPP Teacher include overseeing and accommodating ADA inmates in educational programs,

8

answering ADA related appeals and assisting in facility libraries. Bergmann Decl. ¶ 2. Mr. Bergmann states that during the period at issue, prison officials required documentary evidence to verify that an inmate had a learning disability. Bergmann Decl. ¶ 5. Verification of a learning disability could be accomplished by: (1) diagnosis from a licensed psychologist, credentialed school psychologist or a licensed educational psychologist; (2) a probation officer's report where the probation officer verified a specific learning disability with a school district; or (3) a school transcript from a California public school or a non-California school, with special education requirements equivalent to California Education Code, Sections 56333-56347, that reflect either an individualized education plan (IEP) denoting a specific learning disability or enrollment in Special Education and/or Section 504 classes or service denoting specific learning disabilties. Bergmann Decl. ¶ 5.

In an attempt to verify whether plaintiff had a disability so that he could use the ADA designated computer in facility libraries, Mr. Bergmann reviewed plaintiff's central file, interviewed plaintiff and reviewed plaintiff's education records. Bergmann Decl. ¶ 5. In reviewing plaintiff's central file, Mr. Bergmann did not find any history or reference to a diagnosed learning disability. Bergmann Decl. ¶ 6. Mr. Bergmann contacted all of plaintiff's schools and was unable to find any reference to or mention of his enrollment in special education classes or of having a learning disability. Bergmann Decl. ¶ 7. Mr. Bergmann also received the following information: (1) plaintiff's high school transcripts revealed passing grades in high school English; (2) plaintiff received a high school diploma; and (3) plaintiff received a 12.9 Reading score and 9.4 Language Score on a Test of Adult Based Education (TABE) taken on September 26, 2001. *Id.* Mr. Bergmann authored a memorandum informing plaintiff that he was unable to find evidence of his learning disability and that he did not qualify for the Disability Placement Program. *Id.* In doing so, Mr. Bergmann found that, "the lack of accommodation will not cause 'serious or irreparable harm' because legal work can be conducted via handwriting." Bergmann Declaration, Ex. F.

Defendants also argue that even if the court finds that plaintiff is "disabled" under the meaning of the ADA, plaintiff cannot establish that he is "otherwise qualified to participate in or receive the benefits" of the CDCR program because prison officials were unable to locate any documentary evidence as they required to verify plaintiff's learning disability. DUF 18-19. Defendants further point

out that there is no evidence that plaintiff was discriminated against because of his alleged disability in that plaintiff's typewriter was confiscated pursuant to a prison operation procedure that applied to all inmates at SATF.  DUF 7-11.

The Court finds that Defendants have met their initial burden of informing the Court of the basis for their motion, and identifying those portions of the record which they believe demonstrate the absence of a genuine issue of material fact.  The burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  As stated above, in attempting to establish the existence of this factual dispute, Plaintiff may not rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).

**B.     Plaintiff's Opposition**

In opposition to Defendants' motion for summary judgment, Plaintiff submits his own declaration in which he states that he reads very slowly, less than 100 words a minute; he gets headaches if he reads more than 10 pages; and he has a 4th grade spelling ability.  Hooker Decl. ¶ 5.  Plaintiff argues that his Fourth Grade report card (Opposition, Exhibit "A") shows that he received the lowest possible grade in Reading, Language, Spelling, Science and Health.  Hooker Decl. ¶11.  Plaintiff contends that even though he received B's and C's in high school English, he received D's in History and Social Studies and that in fact his English class was a special education class by 1970's standards. Hooker Decl. ¶12.  Plaintiff contends that passing high school was easy because he was a basketball player and as long as he played, he was guaranteed a "C" average.  Opposition, Exhibit "B."

Plaintiff argues that when the education department could not verify his disability, they should have referred him to an expert.  Plaintiff submits reading and spelling problems that he contends "should be enough for an expert to evaluate and determine that he has a reading and writing disability within the meaning of the ADA.  Hooker Decl. Exhibit A-G.

Plaintiff also submits the declaration of his former attorney who states that during his trial in 1985, he observed that plaintiff had difficulty with spelling and grammar.  Opposition, Exhibit "C."

1  Plaintiff submits the declaration of his mother, Lorena Hooker who attaches letters she received from
2  plaintiff between 1984 and the mid-1990's which she contends evidence his problems with spelling.
3  Opposition, Exhibit "E." Plaintiff also submits the declaration of inmate Andrew Upton who opines that
4  plaintiff is dyslexic based on his review of plaintiff's CDC 602's.  Opposition, Exhibit "G."

**C.      Discussion**

Other than his own self diagnosis and opinions of lay persons, plaintiff has failed to submit any evidence that he suffers from a "disability" within the meaning of the ADA.  While the evidence suggests that plaintiff has difficulty reading and spelling, plaintiff submits no evidence documenting that he is dyslexic or that his difficulty reading and spelling currently "substantially limits a major life activity."  The undisputed evidence is that in 2001, plaintiff's TABE scores were at or close high school level.  DUF 26.  Plaintiff is able to file appeals, pleadings and communicate with individuals outside SATF with the help of other inmates and none of plaintiff's pleadings have been rejected because of poor spelling or grammar.  DUF 30-31.  Plaintiff was able to purchase a new typewriter in 2004, which he keeps in his cell and uses to type his pleadings.  DUF 27-29.

Further, even assuming, plaintiff was found to be "disabled" under the ADA, plaintiff cannot establish that he is otherwise qualified for the CDCR's DPP.  Prison officials were unable to verify plaintiff's learning disability under their criteria.  DUF 16-19.  Plaintiff's records revealed no diagnosis of a learning disability or any evidence that plaintiff ever participated in a special education program. *Id*.

In addition, as noted by defendants, plaintiff has presented no evidence identifying a specific CDCR service, program or activity that he has been excluded from because of his disability.  At the pleading stage, plaintiff's allegations were sufficient. However, at this stage in the proceedings, plaintiff may not rely on the general allegations in his complaint or on general assertions of wrongdoing by defendants or other prison officials.  Plaintiff must come forth with specific evidence that he was excluded from participation in or otherwise discriminated against with regard to CDCR's services, programs, or activities.  See Lovell, 303 F.3d at 1052.  To the extent plaintiff claims he was improperly excluded from CDCR's DPP list, the undisputed evidence demonstrates that during the relevant time period, plaintiff did not qualify for the program.  See DUF 18-19.  To the extent, plaintiff claims he was

excluded from "recreational writing" or "communication" because his typewriter with spell and grammar check was confiscated (See Plaintiff's Opposition at p:25-28), the undisputed evidence demonstrates that shortly after his original typewriter was confiscated, plaintiff obtained a new typewriter, which he uses to type his documents and to communicate. DUF 27-29. Plaintiff is also able to handwrite documents with a pen and paper and file pleadings. DUF 29-30. Library services are also readily available to plaintiff. DUF 36-41.

Finally, plaintiff has failed to demonstrate that he was discriminated against because of his disability. As discussed, under CDCR's policies, plaintiff did not qualify for the DPP. Further, plaintiff's specialized typewriter was confiscated pursuant to Operational Procedure 201XVI(A)(1) which prohibits inmates from having appliances with internal mechanisms for recording capability or transmitting capability. DUF 9. Operation Procedure 201XVI(A)(1) was implemented by SATF prison officials it was determined that electrical devices with internal memory capabilities posed particular dangers and concerns to institutional safety and security because of their ability to store sensitive information. DUF 11. This Operational Procedure applied equally to all inmates housed at SATF. DUF 10.

Neither Plaintiff's verified amended complaint nor Plaintiff's declarations submitted in support of his opposition set forth any specific evidence raising a triable issue of fact concerning the elements of his ADA claim. Plaintiff may not defeat defendants' motion by simply tendering his own opinion and the opinions of lay persons that he is dyslexic and has difficulty reading and spelling. Plaintiff must also do more than attack the credibility of defendants' evidence. See National Union Fire Ins. Co. v. Argonaut Ins. Co., 701 F.2d 95, 07 (9th Cir. 1983). At this stage of the proceedings, plaintiff must come forward with specific evidence to create a triable issue of fact as to any element of his claim for which he will have the burden at trial. He has failed to do so and therefore, defendants are entitled to judgment as a matter of law on plaintiff's ADA claim.[1]

**D.    Monetary Damages**

Defendants correctly point out that even assuming plaintiff could defeat their motion for

---

[1] Because the Court finds Defendant is entitled to summary judgment on the merits of Plaintiff's claim, it does not reach Defendant's qualified immunity argument.

summary judgment on the merits of his ADA claim, plaintiff is not entitled to monetary damages because he cannot show that defendants intentionally discriminated against him.

In Duvall v. County of Kitsap, 260 F.3d 1124 (9th Cir. 2001), the Ninth Circuit stated that "[t]o recover monetary damages under Title II of the ADA or the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant." *Duvall*, at 1138 (citing Ferguson v. City of Phoenix, 157 F.3d 668, 674 (9th Cir. 1998)(footnote omitted)).   The Court also held that deliberate indifference is the appropriate standard to use in determining whether intentional discrimination occurred. *Id.* "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that the likelihood." Id. at 1138 (citing City of Canton v. Harris, 489 U.S. 378, 389 (1988)).  In order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent and involves and element of deliberateness.  *Id.* at 1139.

Here, it is undisputed that prison officials attempted to verify plaintiff's alleged learning disability but were unable to do so.  DUF 16-19.  Plaintiff argues that defendants should have investigated further, but he does not dispute the results of the investigation performed.  It is also undisputed that plaintiff's typewriter was confiscated pursuant to a prison regulation that applied to all inmates at SATF.  DUF 7-11.

There is no evidence of intentional discrimination and therefore, even assuming plaintiff can defeat defendants' motion for summary judgment on the merits of his ADA claim, defendants are entitled to  judgment as a matter on law on the issue of compensatory damages.[2]

V.   Conclusion

Accordingly, based on the foregoing, it is HEREBY RECOMMENDED that Defendants' motion for summary judgment on plaintiff's ADA claim be GRANTED thus concluding this action in it's entirety.

---

[2] Defendants also argue that plaintiff's claims for injunctive relief are barred by res judicata because assuming plaintiff is "disabled, " the class action in Armstrong v. Davis , C 94-2307 CW (N.D.Cal.) dealt with identical claims and was adjudicated to a final judgement, permanent injunction and court ordered remedial plan.  In light of the court's finding that defendants are entitled to judgment on the merits of plaintiff's ADA claim, this argument is moot.  However, the court notes for the record that defendants have not sufficiently shown that plaintiff's claims fall under the Armstrong decree.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within thirty (30) days after being served with these findings and recommendations, plaintiff may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff is advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **July 17, 2008**          /s/ **Dennis L. Beck**
                                   UNITED STATES MAGISTRATE JUDGE